STATE OF NEBRASKA, APPELLEE, V. JUAN DEJESUS,
ALSO KNOWN AS CHRIS DEJES, ALSO KNOWN AS JUAN
SETTE, ALSO KNOWN AS CHRIS SETTE, APPELLANT.
347 N.W.2d 111

Filed March 30, 1984.   No. 83-467.

E. Dean Hascall of Hascall, Jungers & Garvey, for appellant.

Paul L. Douglas, Attorney General, and Mark D. Starr, for appellee.

KRIVOSHA, C.J., BOSLAUGH, WHITE, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ.

GRANT, J.

The defendant, Juan DeJesus, also known as Chris Dejes, also known as Juan Sette, also known as Chris Sette, was initially charged by complaint filed in the county court for Sarpy County on October 29, 1981, with carrying a concealed weapon on or about October 28, 1981.   Preliminary hearing was set for November 19, 1981.   Defendant posted bond and was released.   He did not appear for the preliminary hearing.

On January 18, 1982, an information was filed in the district court charging defendant, in two counts, with carrying a concealed weapon on or about October 28, 1981, and with failing to appear for the preliminary hearing on November 19, 1981. The record is not clear, but apparently defendant had been re-arrested on December 29, 1981. On January 16, 1982, the record shows, defendant had posted 10 percent of a $35,000 bond and was released on that bond, conditioned that defendant appear and "answer the charge of Capias; Failure to Appear - Doc. 48 Page 242 . . . ." Arraignment was set for February 5, 1982. Defendant's counsel, an assistant public defender, appeared at that arraignment, but defendant did not. Another capias was issued on February 5, 1982.

On February 26, 1982, an "Amended Information" was filed. This amended information charged defendant, in three counts, of (1) carrying a concealed weapon on October 28, 1981; (2) failure to appear for the preliminary hearing on the weapons charge on November 19, 1981; and (3) failure to appear at the arraignment on the information filed January 18, 1982, which arraignment had been set for February 5, 1982.

Defendant appeared before the district court for Sarpy County on March 3, 1983. Again the record is not precise on the dates of various happenings, but it appears from a letter written by defendant, under date of July 10, 1982, to the county attorney of Sarpy County (and immediately forwarded by that attorney to the public defender) that defendant was in jail in California. This letter was received in evidence in the trial and indicates that defendant, because of outstanding warrants in California, had not appeared as ordered in the Sarpy County District Court but had returned to California and was arrested and jailed there. Other exhibits indicate that defendant was sentenced in San Mateo County, California, on August 2, 1982, to a 2-year term, plus an

additional year as an enhancement, and that on September 8, 1982, he was sentenced in Marin County, California, to a term concurrent with his earlier California sentence. Defendant was returned to Sarpy County on March 1, 1983, for proceedings there.

On March 3, 1983, the defendant appeared without counsel in district court, specifically waived counsel for his arraignment, was arraigned, and entered pleas of not guilty to all three of the above charges. The defendant desired to represent himself pro se, with a public defender appointed as an "adviser" in further hearings.

Defendant appeared before the trial court again on March 25 and April 4 and 6, 1983. At that time it appeared that the public defender might well be a witness as to defendant's various failures to appear, and the trial court therefore appointed a private attorney to represent defendant or to act as defendant's legal adviser. The defendant was found guilty of all three charges after a jury trial in May 1983. Defendant was sentenced to a term of 18 months to 5 years on the weapons charge (with this term to be served concurrently with a term defendant was then serving in California) and to consecutive 1-to-3-year and 3-year terms on the failure to appear charges. Defendant appeals, alleging in his assignments of error that the trial court committed three errors. For the reasons hereafter set out we affirm.

First, the defendant alleges the trial court erred in conducting the arraignment of the defendant without having had a preliminary hearing pursuant to Neb. Rev. Stat. § 29-1607 (Reissue 1979). The record shows that on March 3, 1983, the defendant was brought before the trial court for arraignment on the amended information. The record contains no transcript of a preliminary hearing on any of the three charges in the amended information. The defendant stated to the court that he had been incarcerated in California and was returned to Nebraska. The trial

judge explained the arraignment procedure to the defendant, ånd apprised him of his right to counsel. The following colloquy then took place between the court and defendant: "THE COURT: All right. Now, you'd like to have the public defender as a legal advisor, I take it. MR. SETTE: Yes, Your Honor. THE COURT: Okay, then I'm going to continue the arraignment 'til tomorrow morning. MR. SETTE: You can arraign me now. I don't mind about the arraignment part. You can arraign me now, I'll waive the — I will waive the public defender now to save you time, 'cause it's only an arraignment." The defendant was then arraigned and entered pleas of not guilty to all three charges.

Section 29-1607 provides: "No information shall be filed against any person for any offense until such person shall have had a preliminary examination therefor, as provided by law, unless such person shall waive his right to such examination . . . ." No preliminary hearings were conducted as to any of the three charges. Again, the record is woefully inadequate as presented to this court as to any waivers of such preliminary hearings. We have gleaned certain facts from the record, however, in the trial cross-examination of James Miller, the public defender of Sarpy County, and in the direct examination of Mr. Miller in an earlier proceeding in the trial court in connection with defendant's motion to dismiss all charges because of the State's failure to afford him a speedy trial. Those facts are that Mr. Miller represented defendant prior to the filing of the last information. Mr. Miller testified that he received notice of a preliminary hearing to be held on January 7, 1982. Mr. Miller testified: "I represented Mr. Sette at the bond hearing and worked out a deal for the bond for him and his wife, and that involved waiving a preliminary hearing on Mr. Sette's part so that his wife's bond could be reduced . . . . Due to the fact that I'd represented him at the bond review and had worked out the deal on the bond for

his wife and had waived a preliminary hearing as part of the deal, my name became his attorney of record of the District Court." Mr. Miller further testified that defendant was personally present "to waive a formal hearing."

By piecing together the times of the filing of the various informations, it is clear that defendant, with counsel, waived any required preliminary hearing on the counts concerning carrying a concealed weapon and the failure to appear for a preliminary hearing on November 19, 1981. Such a waiver, particularly with counsel present, is clearly authorized by § 29-1607.

Further, with that background, the dialogue set out above between defendant and the trial court constitutes a valid waiver of counsel at that point, and a waiver of the right to a preliminary hearing on the third count. The right to a preliminary hearing is waived by entering a plea of not guilty in the district court. See, *Dinsmore v. State*, 61 Neb. 418, 85 N.W. 445 (1901); *Roberts v. State*, 145 Neb. 658, 17 N.W.2d 666 (1945). Defendant's pleas of not guilty on March 3, 1983, were made voluntarily and, in all probability, with as much awareness of what was taking place as any other participant in the plea. This assignment of error is without merit.

Next, the defendant alleges the trial court erred in failing to grant a motion to suppress evidence taken from the defendant as a result of a search and seizure, which defendant alleges was conducted by law enforcement officers without a warrant and without sufficient probable cause. Defendant, in this assignment of error, raises two points. He initially complains of the seizing of a driver's license from a wallet in his hands, and he next complains of an ensuing "pat-down" search.

The record shows that on October 28, 1981, at approximately 6:10 a.m., a Sarpy County deputy sheriff, Sgt. Robert Bruecher, responded to a traffic accident at the intersection of Highway 73-75 and

Harvel Drive. Upon his arrival the officer observed that a Volkswagen had been struck in the rear by a larger Mercury Cougar. It was later determined the accident occurred while the Volkswagen was stopped for a red light.

The defendant was standing near the driver's door of the Mercury. The defendant's clothing was several sizes too large for him, requiring him to hold up the pants with one hand. When Sergeant Bruecher approached the defendant and requested a driver's license, defendant began screaming at him—sometimes in English and sometimes in a language foreign to Sergeant Bruecher—and refused to identify himself. The defendant's behavior prompted Sergeant Bruecher to call for additional police assistance.

Bellevue police officer John Stacey arrived to assist Sergeant Bruecher. Stacey described the defendant as nervous and pacing back and forth. When Officer Stacey arrived, he heard defendant yelling in a loud voice at Sergeant Bruecher. Stacey requested identification from defendant. The defendant finally produced a wallet from the oversized pants he was wearing, and began fumbling through the card section. Officer Stacey observed the defendant pass over what was plainly a Nebraska driver's license as he went through the cards. Defendant removed two cards and handed them to the officer. These cards did not show sufficient identification to satisfy the officer. The officer finally reached over and took the driver's license from the cards. The wallet itself remained in the defendant's hands at all times.

The defendant said to the police officer that the picture on the driver's license "doesn't even look like me, does it?" At this point, based on all that had been observed, the officer testified he was suspicious that the defendant may have stolen the wallet, and a pat-down search was conducted. A

handgun was found in the defendant's right jacket pocket, and he was arrested.

In explanation of this situation at trial, defendant testified that Barry Belmont and his girl friend had spent the prior evening with defendant and his wife at defendant's home in Omaha. In the early morning hours of October 28, 1981, defendant's wife wanted to get some milk for the children and asked Belmont if she could use Belmont's car. Defendant's wife told defendant to get the keys. Belmont said the keys were in his pants, so defendant put the pants on. Mr. Belmont was a significantly bigger person than defendant. The evidence showed that the car, clothing, wallet, driver's license, and gun were the property of Belmont, but all those items were in defendant's possession at the time of defendant's involvement in the traffic accident.

The facts show that when defendant went through the cards from the wallet in such a fashion that the officer could see plainly what the defendant was examining, he showed no expectation of privacy in that connection. Defendant is presumed to know the requirements of Neb. Rev. Stat. § 60-413 (Reissue 1978), which require that every licensed driver of an automobile shall carry a "license card" which "shall be presented by the licensee for examination . . . upon demand" by any police officer. Recognizing the requirements of that statute, and seeing the agitated, "nervous" state of the defendant, the police officer did not violate any privacy which defendant could reasonably expect by removing a "license card" from a number of documents being displayed to him. As a matter of fact, defendant had already handed the officer two pieces of identification—neither of which was a driver's license card and both of these being cards of Barry Belmont.

With regard to the first of defendant's points on the search issue, it has been correctly pointed out by the defendant that the fourth amendment to the U.S.

Constitution guarantees an individual freedom from unreasonable intrusions by police officers. The question is whether the officers in this case acted in an unreasonable manner.

A brief stop of a suspicious individual in order to determine his identity or to maintain the status quo momentarily while obtaining more information may be most reasonable in light of the facts known to the officer at the time. *State v. Longa*, 211 Neb. 356, 318 N.W.2d 733 (1982). Neb. Rev. Stat. § 29-829 (Reissue 1979) permits officers to make stops without arrest to determine a person's name, address, and explanation of his actions. In the instant case, of course, the original stop was occasioned by the traffic accident, and the first point raised by defendant concerns the extent of the interrogation and the seizure of the driver's license. We hold that Officer Stacey's actions in seizing the license were proper. As we said in *State v. Longa, supra* at 363, 318 N.W.2d at 738, "Neb. Rev. Stat. § 29-829 (Reissue 1979) permits officers to make stops short of an arrest in order to determine the name and address of the person stopped, and receive an explanation of that person's actions. While such 'investigative stops' are governed by the fourth amendment as well, it is clear that 'in appropriate circumstances the Fourth Amendment allows a properly limited "search" or "seizure" on facts that do not constitute probable cause to arrest or to search for contraband or evidence of crime.' *United States v. Brignoni-Ponce*, 422 U.S. 873, 881, 95 S. Ct. 2574, 45 L. Ed. 2d 607 (1975)."

Once the driver's license card was in the officer's hands and the officer saw that it was a license for a "Barry Belmont," with a picture that obviously was not defendant, it is clear that the police officer was fully justified in believing that defendant was a man in possession of another man's wallet and that, in view of all the attendant circumstances, that man should be searched for weapons.

.

This particular exception of a warrantless search and seizure was adopted by the U.S. Supreme Court in *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). The Court in that case held that a police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion.

As stated in *Terry, supra* at 29: "The sole justification of the search in the present situation is the protection of the police officer and others nearby, and it must therefore be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer."

The standard is whether a reasonably prudent man under the circumstances would be warranted in the belief that his safety or that of others was in danger, and each case will have to be decided on its own facts.

We find that, under the facts and circumstances present in this case, the officer's conduct in the "pat-down" search was reasonable and the search was valid; it constituted no intrusion on defendant beyond a proper search for weapons. The trial court was correct in overruling defendant's motion to suppress. The weapon in the pocket of the clothing defendant was wearing was properly received in evidence.

The final assignment of error involves the court's failure at voir dire to sustain the defendant's motion to strike for cause all prospective jurors who indicated they would expect the defendant to testify during the trial.

During examination of the jury panel by defense counsel, the following exchange occurred: "MR. HASCALL: . . . Okay. Let me go to Mr. Adair. Mr. Adair, after the prosecution tells its side of the story, as a fair minded person, would you then want Mr. Sette to tell his side of the story? MR. ADAIR:

I'd sure want both of them to tell it. MR. HAS-CALL: If he didn't tell his side of the story, would you feel he was hiding something? MR. ADAIR: Well, you would always wonder. MR. HASCALL: As a fair minded person, would you want him to explain what his version of the facts were? MR. ADAIR: Yes. MR. HASCALL: And if he didn't tell his side of the story . . . would you kind of wonder subconsciously . . . what's he trying to hide? MR. ADAIR: You always wonder.''

Defense counsel then addressed the panel as a whole and requested a show of hands of all those who would be suspicious if the defendant did not testify. Apparently, some jurors did raise their hands. The court then admonished the panel regarding the defendant's right to remain silent, and then addressed the individual juror and the panel questioned by the defense as follows: ''THE COURT: . . . if Mr. Sette chooses to exercise his right to remain silent, my instruction will be that you're not to take that into consideration at all in determining his guilt or innocence . . . . Now, if that's my instruction, can you follow that? MR. ADAIR: Yes, sir, I would. THE COURT: And you'd disregard the fact he's not testified? MR. ADAIR: That's right. THE COURT: Are there any of the 20 of you, besides Mr. Adair, that would not be able to do that, to put it aside, any of the 20 of you? I see no response. Okay.''

A juror who cannot subordinate his personal views on an issue of law and obey the law in deciding the case must be excused for cause. *State v. Rowe*, 210 Neb. 419, 315 N.W.2d 250 (1982). In this case it appears the trial court's questioning was sufficient to explain to the jury panel its duty to abide by the instructions of law given by the court. All the jurors indicated they could and would follow the court's instructions as to defendant's absolute right to remain silent. It so happened that defendant did testify at the trial, but the court's admonition and explanation

was necessary and proper, and totally removed any possible error in this regard. Defendant's third assignment of error is without merit.

The judgments and sentences of the trial court are affirmed.

AFFIRMED.